Gary COOKS, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–04–00079–CR.

Court of Appeals of Texas,
Texarkana.

Submitted March 23, 2005.

Decided June 2, 2005.

Troy A. Hornsby, Miller, James, Miller & Hornsby, Texarkana, for appellant.

Nicole Habersang, Asst. Dist. Atty., Texarkana, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

OPINION

Opinion by Chief Justice MORRISS.

After kidnapping his former girlfriend, Delana Atkins, at gunpoint as she left work, Gary Cooks forced Atkins to drive her car away from her workplace. Atkins' panicked, erratic driving—resulting from Cooks abducting Atkins, threatening her

life, and shooting his gun in the car—prompted Cooks to take over the wheel. Atkins' subsequent, unsuccessful attempt to escape the car succeeded only in seriously injuring her. Seeking "witnesses" that he did not push Atkins from the car, Cooks took Atkins, first, to an anesthesiologist friend of Cooks and, then, to a former Cooks attorney, each of whom pleaded with Cooks to take Atkins to the hospital for treatment. Two hours after the initial abduction, Cooks drove Atkins to a hospital emergency room.

A central question in this appeal is whether, by taking Atkins to the hospital or by his actions once there, Cooks voluntarily released her in a safe place, thus reducing aggravated kidnapping from a first- to a second-degree felony and reducing the permissible range of sentence. The jury convicted Cooks of aggravated kidnapping and found he did not voluntarily release Atkins in a safe place. In accordance with the jury's sentencing recommendation, the trial court ordered that Cooks serve a life sentence.

Cooks appeals, asserting that he was eligible for a lesser sentence because the evidence established that he released Atkins in a safe place and that, by refusing to appoint another attorney for him, the trial court forced him to represent himself in violation of the Sixth and Fourteenth Amendments. We affirm because we hold (1) sufficient evidence shows Cooks did not voluntarily release Atkins in a safe place, and (2) Cooks made an informed decision to represent himself.

*(1) Sufficient Evidence Shows Cooks Did Not Voluntarily Release Atkins in a Safe Place*

■ Aggravated kidnapping is generally punished as a first-degree felony, carry-ing a sentence of five to ninety-nine years or life. TEX. PEN.CODE ANN. §§ 12.32(a), 20.04(c) (Vernon 2003). At the punishment stage of a trial, an individual convicted of aggravated kidnapping is eligible for a lesser sentence if he or she can show by a preponderance of the evidence that he or she "voluntarily released the victim in a safe place." TEX. PEN.CODE ANN. § 20.04(d) (Vernon 2003). If the defendant successfully shows this mitigating factor, the offense becomes punishable as a second-degree felony rather than a first-degree felony, and supports a shorter sentence. *See Brown v. State*, 98 S.W.3d 180, 181–82 (Tex.Crim.App.2003).

Here, the jury considered and rejected Cooks' claim of voluntary release. Cooks argues that the evidence conclusively established he voluntarily released Atkins in a safe place. To address this point, we (A) address the appropriate standard by which we review evidentiary sufficiency, (B) review caselaw interpretations of the statutory concept of voluntary release in a safe place, and (C) assess the evidence against those interpretations, in light of that standard.

*(A) Standard of Review*

*(i) Legal Sufficiency Review*

We recognize some disagreement among the intermediate courts of appeals in Texas as to whether we have jurisdiction to consider the legal sufficiency of the evidence on an issue where the defendant has the burden of proof by a preponderance of the evidence.[1] We agree with the majority view as expressed by the Fort Worth Court of Appeals that the *Sterner* standard is the proper legal standard of review for a criminal defendant's legal sufficiency

---

1. *See Ballard v. State*, 161 S.W.3d 269, 272, 2005 Tex.App. LEXIS 2706, at *4–*7 (Tex. App.-Texarkana 2005, no pet. h.).

challenge to the trier of fact's rejection of his or her assertion of the sentence reduction in Section 20.04(d). *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Howard v. State,* 145 S.W.3d 327, 332 (Tex.App.-Fort Worth 2004, no pet.).

Under the *Sterner* standard of review, an appellant challenging the legal sufficiency of the evidence to support an adverse answer on which he or she had the burden of proof must satisfy two inquiries. *Sterner,* 767 S.W.2d at 690. First, the reviewing court must examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the finding, then the reviewing court must examine the entire record to see if the contrary proposition is established as a matter of law. *Id.*

### (ii) Factual Sufficiency Review

The proper standard for reviewing factual sufficiency where the law dictates that the defendant has the burden of proof by a preponderance of the evidence is whether, after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz v. State,* 785 S.W.2d 146, 154–55 (Tex.Crim.App.1990).

### (B) Voluntary Release in a Safe Place

The cases determining when a kidnapper voluntarily releases the victim in a safe place require the kidnapper to release the victim without any element of rescue or escape.

In *Brown,* the appellant stabbed his victim in the neck with a knife and kidnapped her. *Brown,* 98 S.W.3d at 182. The seriously injured victim later persuaded Brown to release her at a hospital by promising him that she would "tell them [that she] did it." After a jury convicted Brown of aggravated kidnapping, he requested that the jury sentence him as a second-degree felon because he voluntarily released his victim in a safe place. The trial court, agreeing with the State, concluded Brown had not voluntarily released his victim because he had been tricked or manipulated into bringing her to the hospital. *Id.* The Tyler Court of Appeals agreed, holding that, in order for the action to qualify as a voluntary release, the action must be the spontaneous product of the actor's free will, uninfluenced by another's persuasion, coercion, or solicitation. *Id.*

The Texas Court of Criminal Appeals disagreed with the Tyler court, rejecting a broad definition and, instead, applying a narrow definition of "voluntary" when determining the application of Section 20.04(d). *Id.* at 188. In order for the action to be voluntary, there must be no elements of escape by the victim or rescue by the police or by others. *Id.* (citing to Comments to Model Penal Code, Section 212.1, at pages 233–34). The court concluded such a definition was consistent with the legislative purpose of Section 20.04(d) to encourage kidnappers to release their victims. *Id.* Therefore, the Tyler court erroneously applied a broad definition. *Id.*

On remand, the Tyler court concluded that, based on the narrow definition of "voluntary release," Brown should have been subject to the lesser sentence under Section 20.04(d), although he may have been tricked into bringing his victim to the hospital. The Tyler court reversed and remanded the case for a new punishment hearing. *Brown v. State,* 109 S.W.3d 550, 551 (Tex.App.-Tyler 2003, no pet.).

Although decided before *Brown,* this Court's rationale in *Carreon v. State,* 63 S.W.3d 37, 39 (Tex.App.-Texarkana 2001,

pet. ref'd), remains largely sound in light of *Brown*.[2] Holding that the evidence did not support a Section 20.04(d) instruction, this Court held that application of Section 20.04(d) should focus on the accused's conduct, not the victim's physical condition or ability to escape. *Id.* (citing *Wiley v. State*, 820 S.W.2d 401, 411 (Tex.App.-Beaumont 1991, no pet.)). To qualify for the mitigating effect of Section 20.04(b), an accused "must have performed some overt and affirmative act that brings home to the victim that [he or she] has been fully released from captivity." *Carreon*, 63 S.W.3d at 39–40; *Harrell v. State*, 65 S.W.3d 768, 772 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). Such analysis is consistent with *Brown's* holding that "voluntary release" does not include any element of rescue or escape.

*(C) Cooks Did Not Voluntarily Release Atkins*

■ The record reveals that Cooks did not voluntarily release Atkins, but was separated from her by hospital personnel, in essence rescuing her from Cooks.

Cooks carried the gun into the hospital in his pocket and quickly took over the conversation with medical personnel, not letting Atkins say anything. He would not let her call her parents, but called them for her. Finally, she testified, he gave her the keys and left.

Sudie Boyd, a triage nurse at Christus St. Michael Hospital, first assessed Atkins on her arrival. She provided relevant details regarding Cooks' departure and confirmed Atkins' statement that Cooks "spoke for her completely." Atkins was not allowed to speak to Boyd, which Boyd

described as "very unusual" in that situation. Cooks even answered for Atkins when Boyd asked her the level of pain she was experiencing. Boyd testified that Cooks stayed near Atkins and the nurse, and that Atkins seemed withdrawn and would not make eye contact with Boyd during the conversation. Boyd took her observations to her senior nurse and asked her to treat Atkins. Eventually, Atkins was taken to a private room for treatment, and Cooks "was escorted by [Boyd] to a family counseling room" in the waiting room. Once separated from Cooks, Atkins finally told the senior nurse that Cooks had kidnapped her and that she sustained her injuries by jumping out of the car in an attempt to escape.

While we have somewhat similar facts as those before the *Brown* court, there are critical distinctions. Here, the evidence shows that the still-armed Cooks accompanied Atkins into the hospital and continued to exert control over her, so much so that the hospital staff felt compelled to intervene by separating the two. Atkins testified that Cooks would not let her speak to the hospital staff. Boyd confirmed this version of events and explained that she became so concerned she sought the aid of her senior nurse to treat Atkins and then escorted Cooks away from Atkins into another part of the facility.

In *Brown*, it is unclear whether Brown accompanied his victim into the hospital. From our reading of the facts, it does not appear he did. This distinction becomes critical to our analysis here because our facts show rescue rather than release. And, under the definition of voluntary release set forth in *Brown*, rescue or escape

---

**2.** We recently questioned *Carreon's* reliance on the language from *Oestrick v. State*, 939 S.W.2d 232 (Tex.App.-Austin 1997, pet. ref'd), however. *Brown's* rejection of a broad definition under Section 20.04(d) called into question the language that the action must be free from compulsion. *See Ballard*, 161 S.W.3d 269, 274, 2005 Tex.App. LEXIS 2706, at *12 n. 5.

will not afford the criminal defendant the mitigating effect of Section 20.04(d). Here, the evidence shows Cooks was separated from Atkins as a result of the observations and actions of healthcare personnel.

Granted, after having been persuaded by his anesthesiologist friend and his former attorney,[3] Cooks brought Atkins to receive medical treatment for her injuries. We are not convinced, however, that the act of taking Atkins to the hospital qualifies as a voluntary release under Section 20.04(d). First, Cooks carried the gun in his pocket as the two entered the emergency room. He continued to stay with Atkins and did not allow her to talk to the staff. He went so far as to answer questions asked for the purpose of diagnosis, such as the level of pain Atkins was experiencing. Such acts are not consistent with release. It was not until the perceptive Boyd detected some troubling aspect of the pair's demeanor that Cooks was artfully separated from Atkins so that she felt "fully released from captivity." It was only then, when she was free from Cooks' control, that she explained what Cooks had done to her. While we understand the objective of Section 20.04(d) is to provide an incentive to kidnappers to release their victims and recognize the wisdom in bringing Atkins to receive medical treatment, we are not prepared to conclude these facts constitute a "voluntary release" under *Brown* when, by all appearances, Cooks retained significant control over Atkins until the intervention by medical personnel.

There is legally sufficient evidence to support the jury's failure to find that Cooks voluntarily released Atkins. Also, we conclude the jury's finding was not against the great weight and preponderance of the evidence. We overrule Cooks' first point of error.

*(2) Cooks Effectively Asserted His Right To Represent Himself*

The trial court twice appointed counsel for Cooks. Cooks was dissatisfied with both attorneys and, although he was given more time than requested to try to retain counsel of his choice, he elected to represent himself at trial. Cooks now complains that the trial court's refusal to appoint a third attorney effectively forced Cooks to represent himself. Citing *Renfro v. State*, 586 S.W.2d 496 (Tex.Crim.App. 1979), Cooks contends the record does not show he knowingly and voluntarily waived his right to counsel. We hold that such a showing is not necessary where, as here, Cooks successfully asserted his right to self-representation. The record is replete with evidence that Cooks effectively asserted such a right and, thus, the trial court was bound to honor that right.

The Sixth Amendment implies the right to self-representation, and the right to assistance of counsel is intended only to supplement that right. *Faretta v. California*, 422 U.S. 806, 807, 829–30, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Although courts sometimes consider the right of self-representation in conjunction with the issue of waiver of counsel, the right of self-representation is an independent constitutional right. *Id.; Martin v. State*, 630 S.W.2d 952, 953 (Tex.Crim.App. 1982). It does not arise from the defen-

---

**3.** We note that these elements of persuasion do not factor into our inquiry as to whether Cooks voluntarily released Atkins. *See Brown*, 98 S.W.3d at 187. As in *Brown*, had Cooks released Atkins at the hospital, the fact that he was persuaded to do so would not disqualify him from receiving the mitigating effect of Section 20.04(d). Here, however, the intervention by third parties, separating the two after they arrived at the hospital, militates against a finding of voluntary release.

dant's power to waive the assistance of counsel. *Lambrecht v. State,* 681 S.W.2d 614, 615 n. 2 (Tex.Crim.App.1984); *Martin,* 630 S.W.2d at 953. Therefore, exercising the right of self-representation does not require the defendant to first knowingly and intelligently waive the right to the assistance of counsel. *See Saunders v. State,* 721 S.W.2d 359, 362 (Tex.App.-Tyler 1985, pet. ref'd). The defendant's demand for self-representation cannot be denied due to the record's failure to reflect effective waiver of right to counsel. *Id.* The validity of the defendant's assertion of the right to self-representation depends on whether the defendant was aware of the dangers and disadvantages of self-representation, rather than the traditional analysis for waiver of counsel. *Johnson v. State,* 760 S.W.2d 277, 278 (Tex.Crim.App. 1988) (plurality op.). That is, the issue here is whether Cooks effectively *asserted* his right to represent himself, rather than whether he effectively *waived* his right to counsel. *See id.*

A trial court need not follow a "formulaic questioning" or particular "script" to assure itself that an accused who has asserted his or her right to self-representation does so with "eyes open." *Burgess v. State,* 816 S.W.2d 424, 428 (Tex. Crim.App.1991). The record must be sufficient for the reviewing court to make an assessment that the defendant was made aware of the dangers and disadvantages of the self-representation. *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525; *Goffney v. State,* 843 S.W.2d 583, 585 (Tex.Crim.App.1992); *Johnson,* 760 S.W.2d at 279.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee the right of an accused to conduct his or her own defense. *Faretta,* 422 U.S. at 807, 95 S.Ct. 2525. Thus, the defendant decides whether to accept assistance of counsel or to conduct his or her own defense, and the United States Supreme Court in *Faretta* mandated that "his choice must be honored" when the benefits of the assistance of counsel are knowingly relinquished with an informed awareness of danger and disadvantages of self-representation. *Id.* at 834, 95 S.Ct. 2525; *Burton v. State,* 634 S.W.2d 692, 694 (Tex.Crim.App.1982).

Reviewing the several pretrial hearings in this case, we see that the trial court made certain that Cooks wanted to proceed pro se and gave him every opportunity to hire counsel or use appointed counsel. The trial court made great efforts, during both the lengthy set of pretrial hearings and the trial, to ensure that Cooks' rights were protected.

The trial court first appointed counsel June 6, 2001. Cooks expressed extreme dissatisfaction with his court-appointed attorney, filing several grievances against him and refusing to speak to him. That attorney moved to withdraw, and the trial court granted the motion. The trial court then appointed Cooks a second attorney, with whom Cooks also became extremely dissatisfied.

On June 19, 2003, Cooks filed a "Waiver of an Attorney" in which he expressed his desire to represent himself and stated that he "fully understands the dangers and disadvantages of proceeding to trial without the assistance of counsel." Cooks also filed a motion to substitute his second appointed counsel with himself. Second counsel moved to withdraw based on the inability to effectively communicate, the fact that Cooks had filed several grievances against him, and Cooks' desire to proceed pro se.

On January 16, 2004, the trial court held a hearing on Cooks' motion to substitute counsel. At this hearing, the trial court warned Cooks he would be held to the

same standards as a lawyer. Cooks requested that he have two to three weeks to see if he could obtain enough money to retain his own counsel. The trial court went beyond Cooks' request and granted him a month. The trial court then asked Cooks if that would be sufficient time, and Cooks responded affirmatively. The State requested that the trial court set the case for trial on February 17, 2004, with the understanding that trial would proceed with either retained counsel or Cooks himself. The trial court asked Cooks if he understood that request, and Cooks responded that he did. The trial court then reminded appointed counsel that he still maintained his position until further notice.

The trial court entered its order allowing defendant to proceed pro se on February 5, 2004. The trial court ordered that second appointed counsel remain in the case in an advisory role. Personnel changes in the trial court caused the case to be continued until March 1, 2004. Cooks then sought another continuance, and the case was set for April 26, 2004.

On March 26, 2004, the trial court held another pretrial hearing in which it confirmed Cooks' wishes regarding representation. The trial court asked Cooks whether he "had indicated ... that [he] wanted to represent [himself]." The trial court then asked whether Cooks intended to continue to represent himself in the case or whether he intended to try to hire counsel. Cooks replied he was going to go ahead and continue to represent himself until further notice. The trial court then expressed concern and asked Cooks to give a more definite statement as to his wishes. The trial court cautioned Cooks and stated the court would prefer that Cooks have an attorney so his rights would be fully protected. The court acknowledged that Cooks had the right to proceed

pro se and asked whether the previous trial judge went over that right with Cooks. Cooks confirmed that the previous trial judge did go over in great detail the right to self-representation.

Following yet another warning that having an attorney would better protect his rights, Cooks then asked about how much more time he could have to try to hire another attorney. The State protested the prospect of further delay since Cooks had been incarcerated for three years on the matter. The trial court expressed its concern about how long the case had been pending and did not allow additional time for Cooks to obtain another lawyer.

Cooks went on to reject his stand-by counsel, stating he did not want stand-by counsel "anywhere near [his] situation." The trial court stated to Cooks, "You've indicated right now that you want to represent yourself, and the Court is going to allow you that opportunity to represent yourself." After addressing several of Cooks' complaints regarding his access to the law library, the trial court again asked whether Cooks was going to continue to represent himself. Cooks responded that it was his intention to represent himself "until further notice, sir, because I don't— I just don't really trust anyone with my life here."

On April 23, during another pretrial hearing, Cooks confirmed he was representing himself, but again voiced his complaints about access to the jail's law library. The trial court loaned him copies of relevant codes and insisted that Cooks be ready for trial. After the trial court again insisted that the matter go to trial the next week, Cooks protested:

[F]or the record, too, I'd like to acknowledge that I have not been represented fairly. I've been here three years. That's a long sentence to me. Anybody that do [sic] the time would see what I'm

saying. But I've been here without correct due process or anything. I've been in this place three years without any benefit of due process whatsoever, and I've been totally ignored, and now I'm going to jury trial, and I've already served basically a sentence already.

The trial court noted that Cooks had been appointed counsel twice and affirmatively chose not to use either. The trial court also pointed out that Cooks had indicated he wanted to represent himself or hire his own counsel, to which Cooks replied, "Yes, I truly do. But see, with all due respect, once again, sir, I am not ready due to the fact that I have not had the right material, and three or four days is not enough time for me to get in those books like that."

When Cooks moved the trial court to acknowledge the fact "that [his] Sixth Amendment has been violated severely," the trial court and the State responded that Cooks repeatedly sought to represent himself. Then Cooks went in another direction, complaining again about access to the law library. When the trial court refused to continue the case again [4] and encouraged Cooks to utilize stand-by counsel for any questions, Cooks replied he was going to go ahead as planned. He noted again that he thought his rights were severely violated and "hope[d] everybody in here hear (sic) me." On the scheduled trial date, based on Cooks' several and insistent complaints that he was not ready and had no access to the law library, the trial court reluctantly agreed to continue the case to June 1, 2004, so Cooks would have enough time to use the library and subpoena witnesses. The trial court also asked whether Cooks still wished to proceed pro se:

The Court: You have chosen to represent yourself in this case, and the Court is going to allow you that opportunity. And I believe that is how you want to proceed, is that correct?

Mr. Cooks: (Nods affirmatively.)

The Court: You're nodding your head, and that means yes.

Mr. Cooks: Yes, sir.

The trial court then fielded general questions from Cooks about how the case would progress. Finally, the trial court held three more pretrial hearings in which it ruled on Cooks' pro se motions and took steps to remedy his complaints regarding law library access.

In the extensive pretrial period, Cooks complained about his appointed attorneys, complained about access to the law library, and often cited due process violations. But he did not request a third appointed attorney. In fact, he stated he did not trust an attorney to handle such a serious matter. And he affirmatively rejected the idea of getting another court-appointed attorney. The trial court gave him ample time to seek retained counsel, but Cooks never provided the trial court with any indication that he was actively pursuing such a route. Rather, it would appear from the record that Cooks used the prospect of retaining counsel as a tactic to delay the trial further.

In his "Waiver of an Attorney," Cooks expressed his desire to represent himself and affirmatively stated that he "fully understands the dangers and disadvantages of proceeding to trial without the assistance of counsel." He also represented to the trial court that the previous trial judge

---

4. While Cooks continually sought continuances in the trial, he had also filed in this Court a petition for a writ of mandamus to compel the trial court to rule on the several motions he had prepared and filed pro se.

The trial court was aware of this petition and expressly attempted to give Cooks the relief requested. *In re Cooks*, No. 06–04–00053–CV, 2004 WL 905958 (Tex.Appp.-Texarkana 2004).

had gone over in great detail the right of self-representation. Additionally, the record contains several warnings by the trial court that Cooks would be held to the same rules as would a lawyer and that his rights would likely be better protected by trained counsel. Despite these ample warnings regarding the dangers and disadvantages of self-representation, Cooks knowingly chose to exercise his constitutionally guaranteed right to represent himself. We overrule Cooks' second and final point of error.

Having overruled both of Cooks' points of error, we affirm the trial court's judgment.

Justice CARTER, Concurring.

I concur in the majority opinion, but I believe there is another reason to hold the trial court did not err on the issue of self-representation.

Even though Cooks had rejected the attorneys appointed to represent him and manage his case and insisted on self-representation, the trial court provided him with standby counsel throughout the entire course of the proceedings. Is it error to fail to admonish a defendant of the dangers and disadvantages of self-representation when he is provided standby counsel? The Fourteenth Court of Appeals addressed this issue in *Robertson v. State*, 934 S.W.2d 861 (Tex.App.-Houston [14th Dist.] 1996, no pet.). There the defendant rejected his court appointed counsel and invoked his right of self-representation, but the trial court required the attorney to remain in the case in the event the defendant wanted to utilize his services. The defendant conducted the trial himself, and the attorney did not participate. On appeal, the defendant complained that his waiver of counsel was not knowingly made because the court failed to admonish him of the dangers and disadvantages of self-

representation. In analyzing this issue, the Fourteenth court explained the differences in full representation by counsel, pro se representation, hybrid representation, and stand-by counsel. Before the *Robertson* opinion, the Texas Court of Criminal Appeals held that a defendant electing hybrid representation was not entitled to the admonishments concerning the dangers of self-representation since counsel was available to the defendant and participated in the trial to some degree. *Maddox v. State*, 613 S.W.2d 275, 286 (Tex.Crim.App. [Panel Op.] 1980) (op. on reh'g). In *Robertson*, the court held that, although it was preferable to admonish a defendant when standby counsel is appointed, it is not required. Waiver of counsel and the need to admonish arise only where a defendant waives counsel in the sense of having none available; in other words, when the situation neither involves a hybrid representation or standby counsel. 934 S.W.2d at 865. Because both hybrid representation and standby counsel involve the defendant's assuming control over important tactical considerations and deciding the extent to which the assistance of counsel will actually be invoked, no basis exists on which to treat standby counsel differently for purposes of admonishment. *Id.* Therefore, the court held that the failure to admonish Robertson of the dangers and disadvantages of self-representation was not error since he was provided standby counsel. *Id.* at 866.

The holding in *Robertson* has been followed by the Houston First Court of Appeals in *Walker v. State*, 962 S.W.2d 124 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). Walker conducted his own trial, but did have standby counsel available, and the court held that the failure to admonish him concerning the *Faretta* factors was not error. *Id.* at 127. Unpublished cases have adopted the reasoning of the

*Robertson* case. *Young v. State*, No. 05–98–00036–CR, 2000 WL 2676, 2000 Tex. App. LEXIS 15 (Tex.App.-Dallas Jan.4, 2000, no pet.) (not designated for publication); *Ivory v. State*, No. 14–97–00421–CR, 1999 WL 548234, 1999 Tex.App. LEXIS 5590 (Tex.App.-Houston [14th Dist.] July 29, 1999, pet. ref'd) (not designated for publication). For this additional reason, I concur in the Court's opinion.